# EXHIBIT

## "A"

FINANCIAL INDUSTRY REGULATORY AUTHORITY (FINRA)
DISPUTE RESOLUTION

In the Matter of Arbitration Between

PAMELA GRAVIET,

        Claimant,

and

WORLD GROUP SECURITIES, INC.,

        Respondent.

## · STATEMENT OF CLAIM

### I.   OVERVIEW

1.   Claimant Pamela Graviet ("Claimant" or "Ms. Graviet") alleges violations of the California Consumer Legal Remedies Act, as well as common law causes of action for breach of fiduciary duty, negligence, and breach of contract.  Additionally, Respondent World Group Securities, Inc. ("Respondent" or "World Group") is liable under the doctrine of *respondeat superior*, as well as for failing to adequately supervise its registered representatives and agents.

2.   Specifically, Respondent World Group – through its agents, apparent agents and representatives – abused Ms. Graviet through its aggressive sales practices, which involved recommending that she borrow against her home (using an adjustable- rate "negative amortization" loan) in order to purchase unsuitable products through Respondent's agents.  As a result of Respondent's egregious conduct, Ms. Graviet has suffered substantial damages.

## II.    THE PARTIES

3.    Ms. Graviet is a 52 year-old single mother of two children under the age of 18 (for whom she 100% is financially responsible) residing in Galt, California. She recently lost her job as a marketing representative for a local vineyard and currently is unemployed. At the time that the alleged conduct occurred, Ms. Graviet worked in marketing for a small local vineyard and earned a modest salary. Ms. Graviet has been diagnosed with a rare chronic health condition known as idiopathic subglottal laryngeal stenosis, which has required nine surgeries to date, and will require many more surgeries over the balance of her lifetime (in order to keep her airway open). While Ms. Graviet has a college degree, she has little, if any, knowledge of investments, securities or financial planning. As such, she placed her full trust and confidence in Respondent and its representatives to provide her with prudent, suitable advice and guidance.

4.    World Group is a full-service securities broker-dealer and FINRA member firm headquartered in Duluth, Georgia. At all times, World Group and its various representatives with whom Ms. Graviet came in contact held themselves out as possessing superior knowledge and expertise in the area of wealth management and investment and insurance planning.

5.    Notably, in October 2008, the U.S. Securities and Exchange Commission (the "SEC") charged five of World Group's California-based representatives with securities fraud. In its complaint, the SEC alleged that World Group's representatives had placed customers at risk by refinancing the customers' fixed-rate mortgages into adjustable-rate negative amortization loans, in order to fraudulently sell unsuitable securities including variable universal life policies.

## III.    FACTUAL BACKGROUND

6.    During the fall of 2006, Ms. Graviet was solicited by World Group representatives Lori Wagner ("Ms. Wagner") and Zanna Curry ("Ms. Curry"), neither of whom

2

still is with the firm. Upon information and belief, these two female representatives operated as a "team" under the direction of World Group financial advisor and supervisor Michael R. McCurdy ("Mr. McCurdy"), who was their "upline" associate.[1]

7.      During an initial meeting at Ms. Graviet's home, Ms. Wagner and Ms. Curry purported to thoroughly review Ms. Graviet's finances, investments and insurance. During subsequent meetings and phone conferences, Ms. Wagner and Ms. Curry – as well as Mr. McCurdy – both recommended changes to Ms. Graviet's existing investments (consisting of a tax-qualified account with UBS Financial Services, Inc.), as well as actively sought to solicit new business from Ms. Graviet.

8.      In October 2006, Respondent's agents, Ms. Wagner and Ms. Curry, recommended that Ms. Graviet invest in variable universal life and universal life insurance policies with Pacific Life. In order to access funds to invest in those products – as well as to pay the required substantial ongoing premiums associated with the cash value policies – Ms. Wagner and Ms. Curry recommended that Ms. Graviet convert her existing fixed-rate mortgage into an adjustable-rate negative amortization loan, as described below.

## The Negative Amortization Mortgage Loan

9.      Ms. Graviet originally purchased her home in November 2004 using a $400,000 inheritance from her father toward a down payment. At that time, she owed less than $180,000 on her home, had a fixed-rate mortgage, and was able to make her monthly payments. Upon meeting Ms. Graviet in October 2006, Respondent's agents – including, upon information and belief, Mr. McCurdy – recognized that, through the use of an abusive mortgage loan, home

[1] Upon information and belief, and as alleged in the SEC's complaint, World Group and its marketing arm World Financial Group (with whom all World Group representatives were required to be affiliated) operate much like a "multi-level-marketing" company. More specifically, a portion of the revenue generated by an associate – including commissions and mortgage origination fees – is shared with his or her "upline" associate.

equity could be extracted from Ms. Graviet's home and used to purchase unsuitable, high-commission products.

10.     Respondent's agents aggressively sold Ms. Graviet on the mortgage refinance — outlining the procedures for establishing a bank account and paying the hefty premiums for the cash value insurance policies.   Unbeknownst to Ms. Graviet at the time, an adjustable-rate negative amortization mortgage (also called a deferred interest loan) is a predatory loan whereby the required monthly payment is insufficient to cover the interest for that period, and the balance of the loan increases over time.

11.     In November 2006, Ms. Graviet closed on the negative amortization loan in the amount of $640,000.  Of that amount, $429,540 was paid out to Ms. Graviet and used to fund a bank account pursuant to Respondent's agents' instructions.  In connection with the mortgage loan, Quick Mortgage Services, LLC ("Quick Mortgage") was paid an origination fee of $6,400.

12.     It was not disclosed to Ms. Graviet that Ms. Curry as well as Mr. McCurdy were mortgage brokers affiliated with Quick Mortgage, in addition to holding themselves out as representatives of Respondent and its affiliate World Financial Group.  Upon information and belief, Quick Mortgage – which no longer is in business  - was owned by a former World Group branch manager who was an acquaintance of Mr. McCurdy.

### The Life Insurance Policies

13.   .  Using cash obtained from the refinance, as well as a balance that she transferred from an existing insurance policy with Western Reserve Life, in February 2007 Ms. Graviet funded the two universal life policies with Pacific Life.  Ms. Graviet has continued to pay the substantial premiums associated with these policies on an ongoing basis (for instance, the annual

4

premium on the universal life policy is $26,400). In sum, she has paid premiums of more than $165,000 since establishing the two insurance policies.

14.     Universal life policies are considered long-term investments due to the amount of time that it takes to build cash value. Because universal life policies also impose surrender charges (that in some instances are substantial), it is unlikely that a customer surrendering a universal life policy during the first ten years of a policy's life would break even. Respondent failed to disclose the surrender fees and other costs and fees relating to the universal life policies at the time that they were sold. The disclosure of costs and fees associated with Ms. Graviet's policies was inadequate to allow Ms. Graviet to comprehend the level of premium necessary to keep the policies in effect over time.

15.     Moreover, Respondent's agents knew (or were reckless in not knowing) that Ms. Graviet's monthly mortgage payments would increase under the adjustable-rate negative amortization loan, thereby increasing the likelihood that Ms. Graviet would need to surrender the universal life policies. Respondent failed to disclose that risk to Ms. Graviet.

16.     As a result of Respondent's unsuitable recommendations, acts and omissions, Ms. Graviet is saddled with mortgage debt greater than $700,000 on a home that is worth approximately $425,000. Ms. Graviet has attempted to work with her lender to refinance or modify her mortgage loan, but has been unsuccessful. Sadly, she no longer can afford to make her mortgage payments, and cannot pay the substantial premiums associated with the universal life policies.

## Misrepresentations Regarding the Allianz Variable Annuity

17.     In addition to recommending that Ms. Graviet refinance (using the negative amortization loan) in order to purchase the cash value insurance policies, during January 2007

Mr. McCurdy recommended that Ms. Graviet invest in an Allianz variable annuity by transferring funds from a tax-qualified account with UBS Financial Services, Inc.

18.   Mr. McCurdy, as well as Ms. Wagner, misrepresented to Ms. Graviet that the transaction would be done as a "1035 exchange" and that Ms. Graviet would incur no tax liability. In reality, Ms. Graviet learned in 2009 that she would owe the IRS taxes of more than $50,000 as a result of the liquidation of the UBS account.

## Damages[2]

19.   As a result of Respondent's acts, misrepresentations and omissions described above, Ms. Graviet has incurred substantial compensatory and consequential damages including premiums paid on the universal life insurance policies, as well as the loss of equity in her residence. In order to be made whole, among other things, Ms. Graviet will seek to recover the difference between the equity in her home at the time of refinance and the existing, negative equity in her residence as a result of the abusive mortgage loan (adjusted by any decrease in the market value of her property).

## IV.   CAUSES OF ACTION

### 1.   California Consumer Legal Remedies Act

20.   The aforementioned conduct, representations, and omissions by Respondent and its agents violated the California Consumer Legal Remedies Act (the "Act") (California Civil Code §1750, et seq.), including, specifically, the provision of the act making it unlawful for any person to represent that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another. (California Civil Code §1770(a)(7)).

---

[2] Ms. Graviet reserves the right to update her damages calculations at the hearing in this matter.

21.   Pursuant to §1780 of the Act, upon a showing of a violation of §1770 of the Act, prevailing plaintiffs are entitled to attorneys' fees and punitive damages.

2.   **Breach of Fiduciary Duty**

22.   Ms. Graviet reposed complete trust and confidence in Respondent and its representatives to handle her investments in accordance with her objectives and to disclose all material facts and risks. This relationship of trust and confidence caused a fiduciary relationship to be created on the part of Ms. Graviet and Respondent. Once this fiduciary relationship was established, Respondent owed Ms. Graviet fiduciary duties thereunder.[3]

23.   The acts, misrepresentations and omissions described above constituted a breach of this fiduciary duty, showing complete indifference and disregard of Ms. Graviet's best interests. As a direct and proximate result of said breach, Ms. Graviet has suffered substantial damages.

3.   **Negligence/Negligent Supervision**

24.   The conduct of Respondent and its agents, as described above, breached the applicable standard of care owed by Respondent to its customer, Ms. Graviet.[4] Moreover, as

---

[3] "A fiduciary duty is the duty of an agent to treat his principal with the utmost candor, rectitude, care, loyalty, and good faith - in fact to treat the principal as well as the agent would treat himself. The common law imposes that duty when the disparity between the parties in knowledge or power relevant to the performance of the undertaking is so vast that it is a reasonable inference that had the parties in advance negotiated expressly over the issue, they would have agreed that the agent owed the principal the high duty that we have described, because otherwise the principal would be placing himself at the agent's mercy." Burdett v. Miller, 857 F.2d 1375, 1381 (7th Cir. 1992).

In U.S. v. Dial, 757 F.2d 163 (7th Cir. 1985), the court examined the nature of a fiduciary relationship and concluded that, "the essence of a fiduciary relationship is that the fiduciary agrees to act as his principal's alter ego rather than to assume the standard arm's length stance of traders in a market." Id. at 168.

Under California law, the stockbroker-customer relationship is fiduciary in nature, and "imposes on the broker the duty of acting in the highest good faith." Twomey v. Mitchum, Jones & Templeton, Inc., 262 Cal.App.2d 690, 69 Cal.Rptr. 222 (1968).

[4] Courts have expressed the view that the threshold question in a negligence case is whether the defendant owed a duty of care to the plaintiff. Harinek v. City of Chicago, 283 Ill.App.3d 491, 670 N.E.2d 869 (1st Dist. 1996). This duty has been defined as a legal obligation to conform one's conduct to a certain standard for the benefit or

7

discussed above, Respondent and its agents misrepresented or failed to disclose material information to Ms. Graviet.

25.     Additionally, Respondent violated its duties under FINRA and NASD rules.[5] For instance, Respondent's actions violated the following:

- NASD Rule 2310, requiring financial representatives to recommend the purchase, sale, or exchange of a security only upon ascertaining that the recommendation is suitable in view of the customer's other securities holdings, financial situation and needs; and

- NASD Rule 2110, requiring member firms to "observe high standards of commercial honor and just and equitable principles of trade."

26.     Separately, Respondent failed to adequately supervise its representatives as required by NASD Rule 3010 and industry standards.

27.     Respondent's breach of its duties owed to Ms. Graviet was the direct and proximate cause of her damages.

---

protection of another against unreasonable risk of harm. Ziemba v. Mierzwa. 193 Ill.App.3d 662, 549 N.E.2d 1384 (2nd District 1990).

[5] In actions between customers and brokerage firms, such as the case at hand, several courts have held that the rules imposed by securities exchanges and self-regulatory organizations ("SRO's") establish the duty or standard of care that brokers owe to their customers. Vucinich v. Paine, Webber, Jackson & Curtis, Inc., 803 F.2d 454 (9th Cir. 1986); Mihara v. Dean Witter & Co., Inc., 619 F.2d 814 (9th Cir. 1980). Moreover, a negligence claim may be based on the violation of such rules. See, Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Cheng, 697 F.Supp. 1224, 1227 (D.D.C. 1988) (holding that a negligence claim may be maintained for the violation of the NASD Rules of Fair Practice).

In Mihara, the court addressed the issue of whether the lower court properly admitted testimony regarding the broker's adherence to the NYSE and NASD rules. 619 F.2d at 824. The Mihara court stated that NYSE Rule 405, "has been recognized as the standard to which all brokers using the exchange must be held." Id. The Mihara court concluded that both SRO and exchange rules are the professional standard that brokers must abide by in their dealings with customers. Id.

4.    **Breach of Contract**

28.    Ms. Graviet was a third-party beneficiary of the contracts, made in part expressly for the benefit of securities customers, between Respondent on the one hand and self-regulatory organizations such as NASD. Respondent violated the rules of the NASD, as discussed above. As such, Respondent is liable to Ms. Graviet for breach of contract.

5.    *Respondeat Superior*

29.    All acts, practices, misrepresentations and omissions by Respondent's agents described herein were done while acting within the scope of their employment with Respondent. As a result, Respondent is liable for said acts and practices under the theory of *respondeat superior*.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

9

WHEREFORE, Claimant Pamela Graviet respectfully requests the following relief as against Respondent World Group Securities, Inc.:

   a.)   Compensatory and consequential damages in an amount to be determined;

   b.)   Attorneys' fees and punitive damages pursuant to the California Consumer Legal Remedies Act; and

   c.)   Any such other and further relief as is just and equitable.

Respectfully submitted,

PAMELA GRAVIET

By: _____

One of Her Attorneys

James J. Eccleston
Ronald M. Amato
Joshua B. Kons
Eccleston Law Offices, P.C.
One North Franklin Street, Suite 2600
Chicago, IL 60606
T: (312) 332-0000
F: (312) 332-0003
RAmato@ecclestonlaw.com

# EXHIBIT

## "B"

# BrokerCheck Report

## ZANNA CURRY

CRD# 5090542

Report #86559-58069, data current as of Monday, July 23, 2012.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 4 |



**FINRA**

**About BrokerCheck®**

BrokerCheck offers information on all current-and many former-FINRA-registered securities brokers, and all current and former FINRA-registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
    o information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
    o information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.nasaa.org.

- **Are there other resources I can use to check the background of investment professionals?**
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at
brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

FINRA

# ZANNA CURRY
CRD# 5090542

This broker is not currently registered with FINRA.

## Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

This broker is not currently registered with FINRA.

**This broker has passed:**

- 0 Principal/Supervisory Exams
- 1 General Industry/Product Exam
- 1 State Securities Law Exam

## Registration History

This broker was previously registered with FINRA at the following brokerage firms:

**WORLD GROUP SECURITIES, INC.**
CRD# 114473
DULUTH, GA
10/2007 - 01/2008

## Disclosure Events

Disclosure events are certain criminal matters; regulatory actions; civil judicial proceedings; customer complaints, arbitrations, or civil litigations; employment terminations; and financial matters in which the broker has been involved.

Are there events disclosed about this broker? **No**

©2012 FINRA. All rights reserved.    Report# 86559-58069 about ZANNA CURRY. Data current as of Monday, July 23, 2012.



## Broker Qualifications

### Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

This broker is not currently registered with FINRA.

©2012 FINRA. All rights reserved.   Report# 86559-58069 about ZANNA CURRY. Data current as of Monday, July 23, 2012.

# Broker Qualifications

## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

**This individual has passed 0 principal/supervisory exams, 1 general industry/product exam, and 1 state securities law exam.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| No information reported. | | |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| Investment Company Products/Variable Contracts Representative Examination | Series 6 | 10/19/2007 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination | Series 63 | 11/13/2007 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

©2012 FINRA. All rights reserved.    Report# 86559-58069 about ZANNA CURRY. Data current as of Monday, July 23, 2012.

User Guidance



# Registration and Employment History

## Registration History

This broker previously was registered with FINRA at the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 10/2007 - 01/2008 | WORLD GROUP SECURITIES, INC. | 114473 | DULUTH, GA |

## Employment History

Below is the broker's employment history for up to the last 10 years.

**Please note that the broker is required to provide this information only while registered with FINRA, and the information is not updated after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 03/2007 - Present | AFLAC | STOCKTON, CA |
| 12/2006 - Present | WORLD GROUP SECURITIES | LODI, CA |
| 11/2006 - Present | WFG | LODI, CA |
| 04/1995 - Present | TRIZAD ASSOCIATES | LODI, CA |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

TRIZAD ASSOCIATES:
OWNER

©2012 FINRA. All rights reserved.   Report# 86559-58069 about ZANNA CURRY. Data current as of Monday, July 23, 2012.



User Guidance

©2012 FINRA. All rights reserved.   Report# 86559-58069 about ZANNA CURRY. Data current as of Monday, July 23, 2012.

This page is intentionally left blank.

End of Report



User Guidance

# BrokerCheck Report

## LORI ARLENE WAGNER

CRD# 5029648

Report #26666-48092, data current as of Monday, July 23, 2012.

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 4 |
| Disclosure Events | 5 |



# FINRA

## About BrokerCheck®

BrokerCheck offers information on all current-and many former-FINRA-registered securities brokers, and all current and former FINRA-registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.nasaa.org.

- **Are there other resources I can use to check the background of investment professionals?**
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at
brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

# Report Summary for this Broker

**FINRA**

## LORI A. WAGNER
CRD# 5029648

This broker is not currently registered with FINRA.

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

This broker is not currently registered with FINRA.

### This broker has passed:

- 0 Principal/Supervisory Exams
- 1 General Industry/Product Exam
- 2 State Securities Law Exams

## Registration History

This broker was previously registered with FINRA at the following brokerage firms:

**HBW SECURITIES LLC**
CRD# 136959
LODI, CA
02/2009 - 06/2010

**HBW SECURITIES LLC**
CRD# 136959
LODI, CA
02/2008 - 12/2008

**WORLD GROUP SECURITIES, INC.**
CRD# 114473
LODI, CA
02/2006 - 01/2008

## Disclosure Events

Disclosure events are certain criminal matters; regulatory actions; civil judicial proceedings; customer complaints, arbitrations, or civil litigations; employment terminations; and financial matters in which the broker has been involved.

Are there events disclosed about this broker? **Yes**

The following types of disclosures were reported:

Customer Dispute

## Investment Adviser Representative Information

This individual is a broker and an investment adviser representative. For more information about investment adviser representatives, visit the SEC's Investment Adviser Public Disclosure website at: http://www.adviserinfo.sec.gov

©2012 FINRA. All rights reserved.   Report# 26666-48092 about LORI A. WAGNER. Data current as of Monday, July 23, 2012.

# Broker Qualifications

## Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

This broker is not currently registered with FINRA.



©2012 FINRA. All rights reserved.   Report# 26666-48092 about LORI A. WAGNER. Data current as of Monday, July 23, 2012.

# Broker Qualifications

## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

**This individual has passed 0 principal/supervisory exams, 1 general industry/product exam, and 2 state securities law exams.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|---|---|---|
| No information reported. | | |

### General Industry/Product Exams

| Exam | Category | Date |
|---|---|---|
| Investment Company Products/Variable Contracts Representative Examination | Series 6 | 02/21/2006 |

### State Securities Law Exams

| Exam | Category | Date |
|---|---|---|
| Uniform Securities Agent State Law Examination | Series 63 | 02/14/2006 |
| Uniform Investment Adviser Law Examination | Series 65 | 05/28/2009 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

FINRA

# Registration and Employment History

## Registration History

This broker previously was registered with FINRA at the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 02/2009 - 06/2010 | HBW SECURITIES LLC | 136959 | LODI, CA |
| 02/2008 - 12/2008 | HBW SECURITIES LLC | 136959 | LODI, CA |
| 02/2006 - 01/2008 | WORLD GROUP SECURITIES, INC. | 114473 | LODI, CA |

## Employment History

Below is the broker's employment history for up to the last 10 years.

**Please note that the broker is required to provide this information only while registered with FINRA and the information is not updated after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 12/2009 - Present | HBW ADVISORY SERVICES LLC | SIMI VALLEY, CA |
| 01/2009 - Present | HBW SECURITIES LLC | SIMI VALLEY, CA |
| 04/2008 - 01/2009 | WAGNER, CURRY & ASSOCIATES, LLC | UNKNOWN, CA |
| 02/2008 - 12/2008 | HBW SECURITIES LLC | SIMI VALLEY, CA |
| 11/2005 - 01/2008 | WGS,INC | SIMI VALLEY, CA |
| 08/2005 - 01/2008 | WFG | LODI, CA |
| 03/1979 - 03/2007 | SBC | STOCKTON, CA |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

HBW INSURANCE & FINANCIAL SERVICES, INC. SALES OF INSURANCE RELATED PRODUCTS, 0% OWNERSHIP, COMMENCED 01/2008, AGENT. APPLIED GENERAL AGENCY, MEDICARE, COMMENCED 06/2009, 20% TIME SPENT, 0% OWNERSHIP, AGENT.

©2012 FINRA. All rights reserved.     Report# 26666-48092 about LORI A. WAGNER. Data current as of Monday, July 23, 2012.



User Guidance



User Guidance

# Disclosure Events

## What you should know about reported disclosure events:

1. Disclosure events are certain criminal matters; regulatory actions; civil judicial proceedings; customer complaints, arbitrations, or civil litigations; employment terminations; and financial matters in which the broker has been involved.

2. **Certain thresholds must be met before an event is reported to CRD, for example:**
   - A law enforcement agency must file formal charges before a broker is required to report a particular criminal event.
   - A customer dispute must involve allegations that a broker engaged in activity that violates certain rules or conduct governing the industry and that the activity resulted in damages of at least $5,000.

3. **Disclosure events in BrokerCheck reports come from different sources:**
   - As mentioned at the beginning of this report, information contained in BrokerCheck comes from brokers, brokerage firms and regulators. When more than one of these sources reports information for the same disclosure event, all versions of the event will appear in the BrokerCheck report. The different versions will be separated by a solid line with the reporting source labeled.

4. **There are different statuses and dispositions for disclosure events:**
   - A disclosure event may have a status of *pending, on appeal,* or *final.*
     - A "pending" disclosure event involves allegations that have not been proven or formally adjudicated.
     - A disclosure event that is "on appeal" involves allegations that have been adjudicated but are currently being appealed.
     - A "final" disclosure event has been concluded and its resolution is not subject to change.
   - A final disclosure event generally has a disposition of *adjudicated, settled* or *otherwise resolved.*
     - An "adjudicated" matter includes a disposition by (1) a court of law in a criminal or civil matter, or (2) an administrative panel in an action brought by a regulator that is contested by the party charged with some alleged wrongdoing.
     - A "settled" matter generally represents a disposition wherein the parties involved in a dispute reach an agreement to resolve the matter. Please note that brokers and brokerage firms may choose to settle customer disputes or regulatory matters for business or other reasons.
     - A "resolved" matter usually includes a disposition wherein no payment is made to the customer or there is no finding of wrongdoing on the part of the individual broker. Such matters generally involve customer disputes.

**For your convenience, below is a matrix of the number and status of disclosure events involving this broker. Further information regarding these disclosure events can be found in the subsequent pages of this report. You also may wish to contact the broker to obtain further information regarding the disclosure events.**

©2012 FINRA. All rights reserved.    Report# 26666-48092 about LORI A. WAGNER. Data current as of Monday, July 23, 2012.

| Customer Dispute | Pending | Final | On Appeal |
|---|---|---|---|
| | 1 | 0 | N/A |

©2012 FINRA. All rights reserved.   Report# 26666-48092 about LORI A. WAGNER. Data current as of Monday, July 23, 2012.

FINRA

User Guidance

6

## Disclosure Event Details

When evaluating this information, please keep in mind that a disclosure event may be pending or involve allegations that are contested and have not been resolved or proven. The disclosure event may, in the end, be withdrawn, dismissed, resolved in favor of the broker, or concluded through a negotiated settlement for certain business reasons (e.g., to maintain customer relationships or to limit the litigation costs associated with disputing the allegations) with no admission or finding of wrongdoing.

This report provides the information exactly as it was reported to CRD and therefore some of the specific data fields contained in the report may be blank if the information was not provided to CRD.

### Customer Dispute - Pending

This type of disclosure event involves (1) a pending consumer-initiated, investment-related arbitration or civil suit that contains allegations of sales practice violations against the broker, or (2) a pending, consumer-initiated, investment-related written complaint containing allegations that the broker engaged in, sales practice violations resulting in compensatory damages of at least $5,000; forgery, theft, or misappropriation; or conversion of funds or securities.

**Disclosure 1 of 1**

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Employing firm when activities occurred which led to the complaint:** | WORLD GROUP SECURITIES, INC. |
| **Allegations:** | CUSTOMER ALLEGES THE REGISTERED REPRESENTATIVED CONVINCED HER TO REFINANCE HER HOME WITH A NEGATIVE AMOTIZATION LOAN AND USE HER EQUITY TO PURCHASE A VARIABLE UNIVERSAL LIFE INSURANCE POLICY IN OCTOBER 2006. THE CUSTOMER ALSO ALLEGES THAT THE REGISTERED REPRESENTATIVE MISREPRESENTED THE TRANSFER OF FUNDS FROM A TAX QUALIFIED BROKERAGE ACCOUNT TO A VARIABLE ANNUITY AS A 1035 EXCHANGE BUT SUBSEQUENTLY INCURRED A TAX PENALTY FOR THE TRANSACTION. |
| **Product Type:** | Annuity-Variable Insurance |
| **Alleged Damages:** | $66,788.94 |
| **Is this an oral complaint?** | No |
| **Is this a written complaint?** | Yes |
| **Is this an arbitration/CFTC reparation or civil litigation?** | Yes |

©2012 FINRA. All rights reserved.   Report# 26666-48092 about LORI A. WAGNER. Data current as of Monday, July 23, 2012.


User Guidance

**Arbitration/Reparation forum or court name and location:** FINRA DISPUTE RESOLUTION WEST REGIONAL OFICE, LOS ANGELES, CA

**Docket/Case #:** 11-04290

**Filing date of arbitration/CFTC reparation or civil litigation:** 11/19/2011

## Customer Complaint Information

**Date Complaint Received:** 12/27/2011

**Complaint Pending?** Yes

**Settlement Amount:**

**Individual Contribution Amount:**

**Summary:** THE INITIAL CUSTOMER COMPLAINT WAS DENIED 9/13/2010. THE CUSTOMER SUBSEQUENTLY FILED THIS ARBITRATION, IN WHICH THE RR IS THE SUBJECT, BUT IS NOT A NAMED RESPONDENT, AND ADDED THE ALLEGATION PERTAINING TO THE VARIABLE ANNUITY.

..................

**Reporting Source:** Broker

**Employing firm when activities occurred which led to the complaint:** WORLD GROUP SECURITIES, INC.

**Allegations:** CUSTOMER ALLEGES THAT REGISTERED REPRESENTATIVE CONVINCED HER TO REFINANCE HER HOME WITH A NEGATIVE AMORTIZATION LOAN AND USE HER EQUITY TO PURCHASE A VARIABLE UNIVERSAL LIFE INSURANCE POLICY IN OCTOBER 2006.

**Product Type:** Other: VARIABLE UNIVERSAL LIFE

**Alleged Damages:** $16,788.94

**Is this an oral complaint?** No

**Is this a written complaint?** Yes

**Is this an arbitration/CFTC reparation or civil litigation?** No

## Customer Complaint Information

**Date Complaint Received:** 04/08/2010

©2012 FINRA. All rights reserved.   Report# 26666-48092 about LORI A. WAGNER. Data current as of Monday, July 23, 2012.



8

**Complaint Pending?**          Yes

**Settlement Amount:**

**Individual Contribution Amount:**

**Summary:**          I WAS NOT INVOLVED IN ANY NEGATIVE AMORTIZATION LOAN OR INVESTMENT PLACED FROM THAT LOAN. WE USED NON-MORTGAGE MONEY TO FUND A VARIABLE UNIVERSAL LIFE PRODUCT AND TRANSFERRED A UBS ACCOUNT TO A VARIABLE ANNUITY.

©2012 FINRA. All rights reserved.   Report# 26666-48092 about LORI A. WAGNER. Data current as of Monday, July 23, 2012.



User Guidance

This page is intentionally left blank.

End of Report

©2012 FINRA. All rights reserved.    Report# 26666-48092 about LORI A. WAGNER. Data current as of Monday, July 23, 2012.



User Guidance

# EXHIBIT

## "C"



Print

## 12200. Arbitration Under an Arbitration Agreement or the Rules of FINRA

The Customer Code applies to claims filed on or after April 16, 2007. In addition, the list selection provisions of the Customer Code apply to previously filed claims in which a list of arbitrators must be generated after April 16, 2007; in these cases, however, the claim will continue to be governed by the remaining provisions of the old Code unless all parties agree to proceed under the new Code.

Parties must arbitrate a dispute under the Code if:

* Arbitration under the Code is either:

    (1) Required by a written agreement, or

    (2) Requested by the customer;

* The dispute is between a customer and a member or associated person of a member; and

* The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

Amended by SR-FINRA-2008-021 eff. Dec. 15, 2008.
Adopted by SR-NASD-2003-158 eff. April 16, 2007.

Selected Notices: 07-07, 08-57.

©2008 FINRA. All rights reserved.

EXHIBIT

"D"

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 63354 / November 22, 2010

ADMINISTRATIVE PROCEEDING
File No. 3-14132

| | |
|---|---|
| In the Matter of<br><br>**WORLD GROUP<br>SECURITIES, INC.**<br><br>Respondent. | **ORDER INSTITUTING ADMINISTRATIVE PROCEEDINGS PURSUANT TO SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS** |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted pursuant to Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") against World Group Securities, Inc. ("WGS" or "Respondent").

## II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

These proceedings arise out of Respondent's failure to enforce a reasonable system of supervisory policies and procedures to prevent and detect fraudulent conduct by certain registered representatives and to maintain a guideline ratio of registered representatives to supervisors in its Pomona, California branch office from the beginning of 2006 through May 2007 (the "Time Period"). During the Time Period, Respondent failed to require its Pomona branch office to maintain enough supervisors to adequately supervise the branch. While Respondent undertook efforts to add supervisors to, and remove registered representatives from, that office, it failed to do so in a reasonable period of time. During the Time Period, certain registered representatives in the Pomona branch office made unsuitable investment recommendations to customers.

### Respondent

1.      Respondent, World Group Securities, Inc., a Delaware corporation, has been registered as a broker-dealer with the Commission and a member of the FINRA (formerly the NASD) since January 23, 2002.

### Certain Registered Representatives Recommended Unsuitable Securities

2.      Certain registered representatives in the Pomona branch office recommended the use of home equity to purchase variable universal life insurance policies, the recommendation of which was unsuitable.

### Respondent's Failure to Supervise

3.      During 2005, the WGS Pomona branch office experienced significant growth. By June 2005, the Pomona branch office manager supervised approximately 62 registered representatives.

4.      In or around April 2006, there were approximately 185 pending and active registered representatives in the Pomona branch office and only three branch supervisors. Subsequently, the Pomona branch had approximately 225 pending and active registered representatives with approximately three branch supervisors. WGS learned of the growth of the Pomona branch office and the number of supervisors in that office.

---

[1]   The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

5.     WGS advised the branch office manager in the Pomona branch to add additional supervisors, but the branch office manager failed to do so in a timely manner.

6.     In January 2007, WGS placed the Pomona branch office manager on a Performance Improvement Plan ("PIP"), requiring him to increase the number of supervisors by five and reduce the ratio of registered representatives to supervisors to 40:1 as an initial step and then to achieve a ratio of 20:1 thereafter, with a total of 12 supervisors. WGS required that additional supervisors be trained and deployed, but the branch office manager failed to do so in a timely manner.

7.     The branch office manager failed to adhere to the requirements of the PIP and, as of May 2007, the Pomona branch office still did not have an adequate number of supervisors. On May 21, 2007, WGS replaced the branch office manager in the Pomona branch and undertook other measures to ensure an appropriate ratio of registered representatives to supervisors in that office.

8.     WGS has Written Supervisory Procedures ("WSPs") in effect. Every version of the WSPs during the 2004 to 2007 time period included the following language: "A Field Representative may not recommend to a client that he take out a policy loan, home equity line of credit, or any other loan to pay for a securities purchase."

9.     WGS has Transaction Guidelines in effect. The Transaction Guidelines in effect during the 2004 to 2007 time period contained multiple references to WGS's prohibition on the use of home equity to purchase a securities product.

10.     WGS has issued multiple Supervisory and Compliance Alerts and Bulletins emphasizing and reminding registered representatives of WGS's prohibition on the use of home equity to purchase a securities product, including during the 2004 to 2007 time period.

11.     Part of the duties and responsibilities of the Pomona branch office manager included ensuring that the registered representatives under his supervision were aware of WGS's policies and procedures prohibiting registered representatives from recommending that customers use home equity to purchase securities.

12.     During the Time Period, the branch office manager in the Pomona branch failed to communicate WGS's policies to the registered representatives he supervised. In addition, he did not have required quarterly meetings with registered representatives to discuss WGS's policies, transaction guidelines, or supervisory and compliance alerts and bulletins.

13.     Certain registered representatives in the Pomona branch office stated that they were not aware of the foregoing WGS policies and made unsuitable investment recommendations to customers, including recommendations to use home equity to purchase variable universal life insurance policies.

14.     Based on the conduct described above, certain WGS registered representatives in the Pomona branch office violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by recommending that customers purchase unsuitable securities.

3

15.     Based on the conduct described above, Respondent failed reasonably to supervise certain registered representatives in its Pomona branch office within the meaning of Section 15(b)(4)(E) of the Exchange Act with a view to preventing and detecting their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### WGS's Remedial Efforts

In determining to accept this Offer, the Commission considered remedial acts promptly undertaken by Respondent and cooperation afforded the Commission staff.  The remedial acts include, but are not limited to: enhanced disclosure on order tickets; issuing additional written guidance to registered representatives regarding WGS's prohibition on using home equity to purchase securities; increasing the number of employees in the Business Review Department; generating exception reports on the number of registered representatives per supervisor/branch office; terminating approval of mortgage-related outside business activities through a program that is now inoperative; and enhancing regional supervision with a focus on registered representative interviews, reviews, training, and audits.

### Undertaking

Respondent undertakes to retain, within 30 days of the date of entry of the Order, at its own expense, the services of an outside vendor not unacceptable to the Division of Enforcement of the Commission to provide suitability training to WGS that will be required to be given to each registered representative annually for the next two years focusing specifically on: (a) suitability of variable universal life insurance policies, and (b) suitability considerations related to using home equity to purchase securities.

Respondent agrees to certify, in writing, compliance with the undertaking set forth above. The certification shall identify the undertaking, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance.  The Commission staff may make reasonable requests for further evidence of compliance, and Respondent agrees to provide such evidence.  The certification and supporting material shall be submitted to Karen L. Martinez, with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60) days from the date of the completion of the undertaking, including annual certification of the completion of the suitability training.

### IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent WGS's Offer.

Accordingly, pursuant to Section 15(b) of the Exchange Act, it is hereby ORDERED that:

A.     Respondent WGS is censured.

B.     Respondent shall, within 30 days of the entry of this Order, pay a civil money penalty in the amount of $200,000 to the United States Treasury.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.  Such payment shall be: (A) made

by wire transfer, United States postal money order, certified check, bank cashier's check, or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (D) submitted under cover letter that identifies WGS as a Respondent in these proceedings and the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Kenneth Israel, Director, Division of Enforcement, Securities and Exchange Commission, Salt Lake Regional Office, 15 W. South Temple, Suite 1800, Salt Lake City, UT 84101.

      C.     Respondent shall comply with the undertaking enumerated in Section III above.

By the Commission.

                           Elizabeth M. Murphy
                           Secretary

Service List

     Rule 141 of the Commission's Rules of Practice provides that the Secretary, or another duly authorized officer of the Commission, shall serve a copy of the Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions (the "Order"), on the Respondent and his legal agent.

     The attached Order has been sent to the following parties and other persons entitled to notice:

Honorable Brenda P. Murray
Chief Administrative Law Judge
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-2557

Karen L. Martinez, Esq.
Salt Lake Regional Office
Securities and Exchange Commission
15 West South Temple Street
Suite 1800
Salt Lake City, UT 84101

World Group Securities, Inc.
c/o Barry Goldsmith, Esq.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, DC 20036-5306

Barry Goldsmith, Esq.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, DC 20036-5306
(Counsel for World Group Securities, Inc.)

EXHIBIT

"E"

1  PHILIP A. MCLEOD, CASB No. 101101
   philip.mcleod@kyl.com
2  ALEXANDER J. CASNOCHA, CASB No. 278803
   alexander.casnocha@kyl.com
3  KEESAL, YOUNG & LOGAN
   A Professional Corporation
4  450 Pacific Avenue
   San Francisco, California 94133
5  Telephone:   (415) 398-6000
   Facsimile:   (415) 981-0136
6
   Attorneys for Respondent
7  WORLD GROUP SECURITIES, INC.

8

9                  **FINRA DISPUTE RESOLUTION**

10

11 PAMELA GRAVIET,                    )  Case No. 11-04290
                                      )
12                      Claimant,     )
                                      )  **RESPONDENT WORLD GROUP**
13           vs.                      )  **SECURITIES, INC.'S ANSWER TO**
                                      )  **THE STATEMENT OF CLAIM**
14 WORLD GROUP SECURITIES, INC.,      )
                                      )
15                      Respondent.   )
16 _____)

17

18         Respondent WORLD GROUP SECURITIES, INC. ("Respondent" or "WGS")
19 respectfully submits this Answer to the Statement of Claim ("SOC") filed by Claimant
20 Pamela Graviet ("Claimant" or "Ms. Graviet"). WGS denies each and every material
21 allegation of wrongdoing and furthermore challenges FINRA's jurisdiction over several
22 of the claims asserted in the SOC.

23 **I.    INTRODUCTION**

24         Claimant seeks to recover purported damages resulting from the re-finance
25 of her home mortgage and her subsequent purchase of three products, two of which were
26 recommended by WGS representatives acting in that capacity. Claimant also purchased
27 a third product, an equity indexed universal life policy (the "Indexed Accumulator II
28 policy"). The Indexed Accumulator II policy is not a security, and was not recommended

                                    - 1 -

                                                            KYL_SF547866

1  by WGS or registered representatives of WGS acting in that capacity.  The Indexed

2  Accumulator II policy was not purchased through, or on the books of, WGS.  Accordingly,

3  two of the transactions which Claimant has put in dispute (i.e., the mortgage re-

4  financing and the Indexed Accumulator II policy purchase) (together, the "non-arbitrable

5  transactions") are not subject to arbitration, as explained more fully below.

6

7  **II.   STATEMENT OF FACTS**

8          In November 2006 Ms. Graviet allegedly re-financed her home mortgage at

9  the recommendation of WGS Representatives Lori Wagner ("Wagner") and Zana Curry

10 ("Curry"), under the direction of Michael McCurdy ("McCurdy").  In February 2007, Ms.

11 Graviet purchased three products allegedly solicited by Wagner and Curry: (1) an

12 Allianz Rewards variable annuity ("the Allianz VA") issued by Allianz Life Insurance

13 Company of America, (2) a SelectExec II variable universal life policy (the "SelectExec II

14 VUL") issued by Pacific Life Insurance Company ("PacLife"), and (3) the Indexed

15 Accumulator II policy, also issued by PacLife.  Now, almost five years after these

16 purchases, Claimant belatedly complains that the products were unsuitable.

17 **III.   CLAIMANT'S NON-ARBITRABLE TRANSACTIONS**

18         Ms. Graviet's claims against WGS that relate to (1) the re-finance of her

19 home mortgage, and (2) the purchase of "the Indexed Accumulator II policy" are not

20 subject to FINRA jurisdiction.  Though WGS is a FINRA member, it is not obligated to

21 arbitrate the non-arbitrable transactions.  At the appropriate time, WGS will make a

22 Motion to Dismiss the claims relating to the home re-finance and the Indexed

23 Accumulator II policy.

24         The Indexed Accumulator II policy is a fixed insurance product, not a

25 security.  Ms. Graviet purchased it directly from PacLife and it was not sold through

26 WGS.  Fixed insurance products, including policies such as the Indexed Accumulator II

27 policy, are transacted through WGS' affiliate, World Financial Group Insurance Agency

28 of California ("WFGIA"), a non-member of FINRA, by independent contractor associates

   (the "Associates") of World Financial Group, Inc. ("WFG").  Associates engaged in the

KYL_SF547866

1   recommendation of non-security insurance products, including the Indexed Accumulator

2   II policy, are also licensed insurance agents of both WFGIA and the particular insurance

3   companies (including but not, limited to, PacLife) with whom they are appointed and for

4   whom they offer such products. Ms. Graviet's purchase of the Indexed Accumulator II

5   policy was not executed by, through, or on the books of, WGS.

6           Additionally, WGS does not participate in mortgage transactions, including

7   re-financings, in any capacity and did not participate in the re-finance of Ms. Graviet's

8   home mortgage. Independent contractor associates of WFG, like Wagner, Curry and

9   McCurdy, were permitted to become associated with third party mortgage brokers as

10  either employees or independent contractors for purposes of engaging in mortgage

11  brokerage activities. Any mortgage activities were conducted through such third party

12  mortgage brokers and WGS was not involved in such transactions. Thus, these

13  allegations do not arise from the business activities of WGS, and are therefore not

14  subject to FINRA jurisdiction.

15  **IV.   GENERAL DENIAL**

16

17          WGS generally and specifically denies each and every allegation of liability

18  or wrongdoing contained in the Statement of Claim. WGS further denies that Claimant

19  was damaged in any sum by WGS' conduct under any theory. WGS further contends

20  that it is not a proper party to the non-arbitrable transactions. WGS also respectfully

21  submits that all claims relating to the non-arbitrable transactions should be dismissed

22  in their entirety, with prejudice.

23  **V.    LEGAL ARGUMENT**

24      **A.    Claimant's CLRA Claim Fails**

25          Claimant's claims under the California Legal Remedies Act ("CLRA") fail.

26  Claimant not only completely fails to identify the source or exact language of the alleged

27  misrepresentations, but she also fails to allege how, when, or even if she was exposed to

28  those misrepresentations, whether she relied on them in relation to the transactions at

- 3 -

1    issue here, and whether that reliance caused her injury.  Furthermore, no CLRA claim

2    can be asserted against WGS, as it was not a party to the non-arbitrable transactions.

3        **B.    There Was No Breach Of Fiduciary Duty**

4            It is well-established federal law that ordinary broker-dealer relationships

5    are not fiduciary in nature.  See, e.g., De Kwiatkowski v. Bear, Stearns & Co., Inc., 306

6    F.3d 1293, 1302 (2d Cir. 2002) (citing cases); see also, Leboce, S.A. v. Merrill Lynch,

7    Pierce, Fenner & Smith, Inc., 709 F.2d 605, 607 (9th Cir. 1983).[1]  In any event: "Those

8    who hire [professionals] are not justified in expecting infallibility, but can expect only

9    reasonable care and competence.  They purchase service, not insurance."  Gagne v.

10   Bertran, 43 Cal. 2d 481, 489 (Cal. 1954).  Claimant's allegations do not establish that

11   WGS violated any duty by failing to exercise reasonable care and competence.

12       **C.    Claims for Negligence, Negligent Supervision and Alleged**
13               **Violations of FINRA Rules Are Without Merit**

14           Claimant's negligence/negligent supervision claim is meritless.  The

15   credible evidence will establish that Curry, Wagner and McCurdy provided Claimant

16   with professional services and did not breach any applicable duties.  Accordingly,

17   Claimant's negligence-based claims should be dismissed.

18           Claimant also alleges that WGS violated various FINRA self-regulatory

19   organization rules.  As a threshold matter, no private right of action exists for violations

20   of FINRA rules.  See De Kwiatkowski, 306 F.3d at 1300 (noting courts "have sensibly

21   declined to infer legal duties from internal 'house rules' or industry norms that advocate

22   greater vigilance than otherwise required by law"); see also Jablon v. Dean Witter & Co.,

23   Inc., 614 F.2d 677 (9th Cir. 1980); Thomson McKinnon Sec., Inc. v. Clark, 901 F.2d 1568

24

25

26   [1]    In California, where courts have held that under some circumstances brokers owe
     discrete fiduciary duties to their clients, those courts have acknowledged that the scope of those
27   duties is limited.  See, e.g., Rosenthal v. Great Western Fin. Secs. Corp., 14 Cal. 4th 394, 425
     (Cal. 1996).
28

-4-

1    (11th Cir. 1990). Such rules are enforceable through the mechanisms of self-regulatory
2    enforcement, not by a private claim in arbitration.

3              Even if Claimant could bring such claims, for all of the reasons explained
4    above, there was neither an actionable misstatement or omission of material fact nor a
5    violation of WGS' duty to observe high standards of commercial honor. The evidence will
6    show that WGS met its supervisory obligations.

7       **D.   There Was No Breach of Contract**

8              Claimant asserts a breach of contract claim against WGS, yet she has failed
9    to identify any contractual provision that was allegedly breached. See Canova v. Trs. of
10   Imperial Irrigation Dist. Employee Pension Plan, 150 Cal. App. 4th 1487, 1494 (Cal.
11   App. 2007) (noting a claimant must show the existence of contract terms). Nor can
12   Claimant point to any contractual provision stating that WGS had an obligation to
13   guarantee the profitability of the products Claimant purchased. For all of the reasons
14   already set forth, WGS acted in accordance with any and all agreements with Claimant.

15      **E.   Claimant's *Respondeat Superior* Claim fails**

16             As discussed above, the Claimant has no basis for a claim of wrongdoing by
17   any WGS representative. Accordingly, she cannot prove vicarious liability based on
18   *respondeat superior* or failure to supervise.

19

20   **VI.   AFFIRMATIVE DEFENSES**

21             1.    As a first affirmative defense, WGS states that FINRA lacks
22   jurisdiction over any and all claims related to the non-arbitrable transactions.

23             2.    As a second affirmative defense, WGS states that the Statement of
24   Claim and each and every cause of action therein fail to state a claim upon which relief
25   can be granted.

26             3.    As a third affirmative defense, WGS states that Claimant directed
27   the purchases that allegedly led to the purported losses, and therefore bears sole
28   responsibility for the alleged losses.

- 5 -

1    4.    As a fourth affirmative defense, WGS states that the damages for

2  which Claimant seeks to hold WGS liable resulted in whole or in part from Claimant's

3  own acts or omissions, and that WGS is not responsible for or liable to Claimant for her

4  own wrongful or negligent acts or omissions.

5    5.    As a fifth affirmative defense, WGS states that the damages for

6  which Claimant seeks to hold WGS liable were proximately caused by Claimant's failure

7  to use reasonable means to mitigate damages.

8    6.    As a sixth affirmative defense, WGS states that the damages for

9  which Claimant seeks to hold WGS liable resulted in whole or in part from acts or

10  omissions of third parties, and that WGS is not responsible for or liable to Claimant for

11  the wrongful or negligent acts or omissions by these third parties.

12    7.    As a seventh affirmative defense, WGS states that Claimant, by her

13  conduct, approved, authorized, and/or ratified WGS' actions.

14    8.    As an eighth affirmative defense, WGS states that Claimant, by her

15  own acts and omissions, is barred from recovery by the doctrines of waiver and estoppel.

16    9.    As a ninth affirmative defense, WGS states that Claimant

17  voluntarily assumed the risk of re-financing her home mortgage and is precluded from

18  recovery herein.

19    10.    As a tenth affirmative defense, WGS states that it is not liable to

20  Claimant because WGS did not owe a fiduciary duty.

21    11.    As an eleventh affirmative defense, WGS states that Claimant's

22  claims are barred in whole or in part by the doctrine of *laches*.

23    12.    As a twelfth affirmative defense, WGS states that attorneys' fees are

24  not recoverable by Claimant.

25    13.    As a thirteenth affirmative defense, WGS states that punitive

26  damages cannot be awarded against it.

27

28

KYL_SF547866

1    14.    As a fourteenth affirmative defense, WGS states that Claimant's

2  purported causes of action are barred in their entirety by applicable statutes of

3  limitation, and/or rules of eligibility.

4    15.    As a fifteenth affirmative defense, WGS states that WGS' conduct

5  was carried out in good faith.

6    16.    As a sixteenth affirmative defense, WGS states that WGS has not

7  caused Claimant to suffer any damages.

8  **VII.   CONCLUSION**

9    For the reasons set forth above, WGS respectfully requests that the Panel:

10    1.    Issue an award finding that Claimant is not entitled to recover

11  damages from WGS and dismissing her claims in their entirety with prejudice;

12    2.    Award WGS its costs; and

13    3.    Award WGS all other relief as provided by law.

14

15

16  DATED: February 1, 2012

17                                        PHILIP A. MCLEOD
                                          ALEXANDER J. CASNOCHA
18                                        KEESAL, YOUNG & LOGAN
                                          Attorneys for Respondent
19                                        WORLD GROUP SECURITIES, INC.

20

21

22

23

24

25

26

27

28

- 7 -

KYL_SF547866

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF SAN FRANCSICO

I am employed in the County of, State of California.  I am over the age of 18 and not a party to the within action; my business address is Keesal, Young & Logan, 450 Pacific Avenue, San Francisco, California  94133.

On February 1, 2012, I served the foregoing documents described as **RESPONDENT WORLD GROUP SECURITIES, INC.'S ANSWER TO THE STATEMENT OF CLAIM** on the parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

| | |
|---|---|
| Ianthe Philips | James J. Eccleston, Esq. |
| **FINRA Dispute Resolution** | Ronald M. Amato, Esq. |
| West Regional Office | Joshua B. Kons, Esq. |
| 300 South Grand Avenue | **Eccleston Law Offices, P.C.** |
| Suite 900 | One North Franklin Street |
| Los Angeles, CA  90071 | Suite 2600 |
| | Chicago, IL 60606 |

☐      BY U.S. MAIL: I enclosed the documents in a sealed envelope or package addressed to the above-named persons at the addresses exhibited therewith and (specify one):

☐      I deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

☐      I placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with this firm's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred.  The envelope or package was placed in the mail at San Francisco, California.

☒      BY OVERNIGHT DELIVERY: I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the above-named persons at the addresses exhibited therewith.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

☐      BY FACSIMILE: Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the above-named persons at the fax numbers

- 8 -

KYL_SF547866

RESPONDENT WORLD GROUP SECURITIES. INC.'S ANSWER TO THE STATEMENT OF CLAIM

1    exhibited therewith. No error was reported by the fax machine that I used. A copy of
2    the record of the fax transmission, which I printed out, is attached.

3         ☐    BY PERSONAL SERVICE: I personally delivered the documents to the
      above-named persons at the addresses exhibited therewith. (1) For a party represented
4    by an attorney, delivery was made to the attorney or at the attorney's office by leaving
      the documents in an envelope or package clearly labeled to identify the attorney being
5    served with a receptionist or an individual in charge of the office. (2) For a party, deliv-
6    ery was made to the party or by leaving the documents at the party's residence with
      some person not less than 18 years of age between the hours of eight in the morning and
7    six in the evening.

8         ☐    E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or
9    an agreement of the parties to accept service by e-mail or electronic transmission, I
      caused the documents to be sent to the above-named persons at the e-mail addresses
10   exhibited therewith. I did not receive, within a reasonable time after the transmission,
      any electronic message or other indication that the transmission was unsuccessful.
11

12        ☐    BY ELECTRONIC: I caused the above-entitled document(s) to be served
      through LexisNexis Courtlink addressed to all parties appearing on the LexisNexis
13   Courtlink electronic service list for the above-entitled case. The file transmission was
      reported as completed and a copy of the "LexisNexis Courtlink Filing Receipt" page(s)
14   will be maintained with the original document(s) in our office.

15        ☐    BY CM/ECF: The document was electronically served on the parties to this
16   action via the mandatory United States District Court of California CM/ECF system
      upon electronic filing of above-described document.
17
           Executed on February 1, 2012 at San Francisco, California.
18
           I declare under penalty of perjury under the laws of the State of California and
19   United States of America that the foregoing is true and correct.

20        I declare that I am employed in the office of a member of the bar of this Court at
21   whose direction the service was made.

22

23   _____
24   Lara L. Joel

25

26

27

28

RESPONDENT WORLD GROUP SECURITIES, INC.'S ANSWER TO THE STATEMENT OF CLAIM

**FINRA ARBITRATION Submission Agreement**

In the Matter of the Arbitration Between

    Name(s) of Claimant(s)

Pamela Graviet

                                            11-04290

    Name(s) of Respondent(s)

World Group Securities, Inc.

1. The undersigned parties ("parties") hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related cross claims, counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.

2. The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these procedures and rules.

3. The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.

4. The parties agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement. The parties further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

_____, Chief Operations Officer _____ 12/29/11 ____

World Group Securities, Inc.                                                    Date

State Capacity if other than individual (e.g., executor, trustee, corporate officer)


LC43A: SUBMISSION AGREEMENT
idr: 02/09/2009

RECIPIENTS:
     Aeysha Murshedi, COO, World Group Securities, Inc.
     World Group Securities, Inc., 11315 Johns Creek Parkway, Duluth, GA 30097-1517


**World Group Securities, Inc. ("WGS") hereby objects and
does not consent to the Arbitration of Claimant's claims to the extent
that they relate to Claimant's purchase of the Indexed Accumulator
II policy or any mortgage refinancing activities, as the purchase
and activities were not executed by, through, or on the books of
WGS and WGS was not involved in the purchase or activities.**